## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| PENNY HUGHES, | : | |
| Plaintiff, | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| THE BRYN MAWR TRUST COMPANY, | : | No. 19-2417 |
| Defendant. | : | |

### MEMORANDUM

Schiller, J.                                                                                    October 27, 2022

Plaintiff Penny Hughes began working at Defendant The Bryn Mawr Trust Company (the "Bank") in 2006. In January 2018, she was terminated for two separate violations of Bank policies. In the years leading up to her termination, she alleges she was subjected to repeated and regular racial discrimination from multiple Bank employees. She asserted claims for employment discrimination, retaliation, hostile work environment, and intentional infliction of emotional distress under applicable federal and state law. The Bank filed a motion for summary judgment on all claims. For the reasons that follow, the Bank's motion is granted.

### I.    BACKGROUND

Hughes is an African American woman who was originally hired by the Bank as a Customer Service Representative in October 2006. (Def.'s Statement of Undisputed Material Facts [Def.'s SUMF] ¶¶ 1-3; Pl.'s Statement of Disputed Facts [Pl.'s SDF] ¶¶ 1-3.) She initially worked at the Bank's branches in Wayne and Bryn Mawr. (Def.'s SUMF ¶ 3; Pl.'s SDF ¶ 3.) In January 2009, she was promoted to Assistant Manager of the Bank's Paoli branch and was then promoted again to Branch Manager of the Bank's Swarthmore branch in July 2011. (Def.'s SUMF ¶¶ 4, 7; Pl.'s SDF ¶¶ 4, 7; *see also* Def.'s Ex. 16 at 25.) In December 2012, she was named the Branch Manager of a new branch opening in Bala Cynwyd, a position she held until she was terminated

on January 31, 2018. (Def.'s SUMF ¶ 8; Pl.'s SDF ¶ 8.) During her tenure at the Bank, her salary and her responsibilities were never reduced. (Def.'s SUMF ¶ 9; Pl.'s SDF ¶ 9.)

### A.  <u>Discriminatory Conduct During Hughes's Employment at the Bank</u>

Hughes asserts that she was subjected to several discriminatory and harassing incidents by various superiors throughout her time at the Bank.

While working as a Customer Service Representative at the Wayne Branch, Hughes was completing paperwork for a new account when Branch Manager Maureen Callaghan threw the papers on the floor. (Def.'s SUMF ¶¶ 15-16; Pl.'s SDF ¶¶ 15-16; Hughes Dep. at 227:18-228:15.) Callaghan expected Hughes to pick up the papers, which Hughes refused to do, and Callaghan screamed at Hughes in front of a customer. (Def.'s SUMF ¶¶ 16-17; Pl.'s SDF ¶¶ 16-17; Hughes Dep. at 228:4-229:21.) After Hughes left the Wayne branch, Callaghan continued to call her to ask whether various accounts would continue to be serviced by the Wayne Branch, which Hughes felt was harassing. (Def.'s SUMF ¶ 18; Pl.'s SDF ¶ 18; Hughes Dep. at 240:22-242:7.)

Sometime before 2010, while she was the Assistant Manager of the Paoli branch, Hughes received "straight fives on her first evaluation," which was a perfect score. (Def.'s SUMF ¶ 20; *see also* Pl.'s SDF ¶ 20.) Steve Novak, who oversaw the Bank's retail branches, told her that would "never happen again." (Hughes Dep. at 233:2-8.) In January 2011, while in a conference room with two other managers, Hughes asked Novak what she would have to do to be promoted. (Def.'s SUMF ¶ 22; Pl.'s SDF ¶ 22; Hughes Dep. at 234:3-15.) Novak told Hughes that she should "mirror" herself after the Bank executives and senior-level employees whose portraits were hanging on the wall. (Def.'s SUMF ¶ 23; Pl.'s SDF ¶ 23; Hughes Dep. at 235:4-21.) Because those individuals were white, Hughes interpreted this as a racial comment—*i.e.*, that she should physically look like them—and told Novak she would never look like those individuals. (Pl.'s

Statement of Disputed Facts in Opp. to Def.'s Statement of Undisputed Material Facts [Pl.'s SDF in Opp.] ¶ 34; Hughes Dep. at 235:4-21; Def.'s SUMF ¶ 24; Pl.'s SDF ¶ 24.) She felt this comment was reflective of an attitude at the Bank that she was expected to be "a yes person. Don't back-talk; don't have an opinion; dress the part; look like the little package and come to work and you'll go far." (Hughes Dep. at 236:14-237:11.)

At some point in roughly 2011 or 2012, one of Hughes's superiors, Robin Otto, criticized her fingernails during a meeting. (Def.'s SUMF ¶ 27; Pl.'s SDF ¶ 27.) Otto touched her fingernails and then told Hughes she should cut her fingernails and wear a specific color of nail polish. (Def.'s SUMF ¶¶ 28-29; Pl.'s SDF ¶¶ 28-29; Hughes Dep. at 191:16-193:16.) At that meeting, Otto also touched Hughes's hair. (Def.'s SUMF ¶ 29; Pl.'s SDF ¶ 29; Hughes Dep. at 197:4-198:6.) Hughes felt "humiliate[ed]" and "embarrass[ed]" as a result. (Hughes Dep. at 192:19-193:9.) She also asserts that, on other unspecified occasions, other managers referred to her nails as "claws" and criticized her makeup. (Pl.'s SDF in Opp. ¶¶ 25-26.)

In 2012, Hughes gave a welcome address at a new employee dinner. (Def.'s SUMF ¶ 32; Pl.'s SDF ¶ 32.) The next time Novak saw Hughes, he told her she should be careful with what she says and how she says it. (Def.'s SUMF ¶ 33; Pl.'s SDF ¶ 33.) He also expressed doubt as to whether Hughes should sit on certain committees because he did not think he could trust what she would say. (Def.'s SUMF ¶ 33; Pl.'s SDF ¶ 33.) Hughes believed this was "very racist" because Novak "would never, ever say that to one of [her] counterparts." (Hughes Dep. at 203:17-21.)

After Hughes became the Branch Manager at the Bala Cynwyd branch, Novak chastised Hughes for seeking new business in the nearby town of Narberth. Novak told Hughes that she should not seek business there because the Branch Manager of the Bank's nearby Ardmore branch (which was roughly as far from Narberth as the Bala Cynwyd branch) was already doing so. (Def.'s

SUMF ¶¶ 35-37; Pl.'s SDF ¶¶ 35-37; Hughes Dep. at 208:6-11.) Hughes believes Novak did this because the Ardmore Branch Manager was white and he preferred having a white employee overseeing the region, which Hughes described as "a predominantly [W]hite rich neighborhood." (Pl.'s SDF in Opp. ¶ 33; Hughes Dep. at 206:22-207:13.)

In 2015, Hughes applied for a Regional Manager position with the Bank. (Def.'s SUMF ¶ 44; Pl.'s SDF ¶ 44.) At the time she applied for the role, Hughes had been a Branch Manager for three or four years. (Pl.'s SDF ¶ 48.) Hughes met with Tina McDonald, Senior Vice President of Retail, to discuss the role in May 2015 but ultimately did not secure the position. (Def.'s SUMF ¶ 47; Pl.'s SDF ¶ 47; Hughes Dep. at 269:12-17; *see also* Compl. ¶ 19.)

In November 2016, Market Area Manager Pat Savino and another manager met with Hughes to discuss her performance.[1] (Def.'s SUMF ¶ 51.) In an accompanying written report, Savino wrote that "she has had concerns which have risen to a level of needing to be addressed." (Def.'s Ex. 222 at 1.) Specifically, Savino and other colleagues "have seen a change in [Hughes's] behaviors recently that have led to this meeting," including "a lack of engagement." (*Id.*) The report questioned whether Hughes was able to "continue to lead our Bala Cynwyd branch." (*Id.*) Some of the criticism in the report included that Hughes was "[d]ifficult to deal with," "[c]ontrolling," often tardy and disrespectful, and failed to appropriately escalate various personnel issues. (*Id.*) The report concluded by recommending Hughes "change her confrontational, negative attitude immediately," but noted that Hughes "has many good attributes, skills and experience that can and do benefit Bryn Mawr Trust." (*Id.* at 2.) Savino hoped that Hughes was "open to change"

---

[1]     The Bank maintains this was Hughes's formal quarterly review. (Def.'s SUMF ¶ 51.) Hughes denies this was a formal review and instead asserts this was merely an opportunity for Savino to "chastise[]" her. (Pl.'s SDF ¶ 51; Hughes Dep. at 271:21-272:4.) But the parties do not dispute that Hughes's job performance was discussed at the meeting.

so the Bank could "support her in becoming a true leader who is supportive of [the Bank's] mission." (*Id.*)

Hughes was "baffled" and "dumbfounded" during the meeting and did not believe the report "had any merit." (Hughes Dep. at 272:21-273:11.) She interpreted the use of the term "confrontational" to be racially charged because "that's a word you use with black people." (*Id.* at 281:10-15.) On November 28, 2016, Hughes responded to the report in an email. (Def.'s Ex. 223.) She challenged the report's contentions as baseless and defended her actions. (*Id.*) She also expressed her hope that she and her superiors could "establish honest and open communication that is not based on perception or hearsay" and that "any negative feedback" could be addressed immediately in the future. (*Id.* at 4.) It is unclear whether Hughes's response prompted any further discussions or whether the Bank took any concrete action to try to improve Hughes's performance following this meeting.

At some point in 2017, Hughes's supervisor, Chris DiBello, asked her to "take one for the team" by taking responsibility for a Bank Secrecy Act ("BSA") violation another team member committed. (Hughes Dep. at 294:12-296:3; *see also* Def.'s SUMF ¶ 65; Pl.'s SDF ¶ 65.) Hughes had "no idea how" the BSA violation could be attributed to her rather than the offending employee, but she asserts that the Bank "did something in the system to put it underneath [her] name." (Hughes Dep. at 295:19-296:3.) Hughes testified that this was "common practice" at the Bank. (*Id.* at 296:4-10.)

With respect to each of these incidents, the Bank maintains that Hughes never lodged any formal complaints to Human Resources. (Def.'s SUMF ¶¶ 19, 21, 26, 31, 34, 39, 67.) Hughes did not recall ever making complaints about discrimination to HR in writing, but testified that she made complaints "face to face." (Hughes Dep. at 159:8-16.) She also testified that she documented

each instance of discrimination she endured, saved the documents to her computer, and "thought" she sent copies of those documents to herself, yet she was unable to locate any of them for this litigation. (*Id.* at 483:18-485:9.)

### B. Hughes's Termination

The Bank claims that two separate incidents it learned of in late 2017 and early 2018, which both violated the BSA and various other Bank policies, led to Hughes's termination. The first involved opening a new account for a customer over a FaceTime video call and subsequently making an improper transfer of funds from the account. The second involved the unauthorized disclosure of information and documents to law enforcement.

#### i. Opening a New Account Over FaceTime

In March 2017, Hughes opened an account for a new customer, Shakara Lebron, while Lebron was receiving medical treatment in the hospital following a car accident.[2] (Def.'s SUMF ¶¶ 70-71.) Lebron's brother, Autuan Reddish, visited the branch and initiated a FaceTime call with Lebron so Hughes could set up Lebron's account. (*Id.* ¶¶ 72-74; Hughes Dep. at 100:1-11.) During the video call, Hughes viewed and verified Lebron's driver's license to confirm her identity. (Def.'s SUMF ¶ 73; Hughes Dep. at 100:12-101:1.)

Once the account was open, Hughes sent an email requesting Lebron sign the account's signature cards. (Def.'s SUMF ¶ 77; Def.'s Ex. 62.) However, the email address appeared to be connected to another individual, Syreeta Carter, rather than Lebron. (Def.'s Ex. 62.) Hughes testified that the discrepancy between Lebron's name and the email address did not raise any red

---

[2]     In her opposition papers, Hughes disputes that she opened this account (*see* Pl.'s SDF ¶¶ 70-71), but her own testimony unequivocally shows that she did so. (*See* Hughes Dep. at 60:18-21 ("Q: You opened an account for [Lebron], right? A: I did. Q: Did you ever meet her? A: I did a video chat with her."); *see also id.* at 72:4-7, 100:1-23, 106:22-107:24.)

flags because she has previously corresponded with individuals with email addresses in another person's name. (Hughes Dep. at 71:23-72:3.)

Roughly two hours after she requested Lebron execute the signature cards, Hughes received an email purportedly from Lebron (using the Syreeta Carter email address) requesting Hughes transfer $49,985 to Reddish's account. (Def.'s Ex. 62 at 2.) The email included her Social Security Number, date of birth, and account number. (*Id.*) Hughes suggested that Lebron "leave something in the account" rather than transferring the full balance. (*Id.*) Later that day, Hughes transferred $45,000 to Reddish's business account. (*See* Def.'s Ex. 65 at 2; *see also* Hughes Dep. at 109:7-22.)

Several months later, in December 2017, Lebron opened a new account at the Bank's Roxborough branch. (Def.'s Ex. 255 at 1.) While there, she informed employees that a Bank employee previously helped her brother transfer $45,000 from her account without her authorization. (*Id.*; *see also* Def.'s Ex. 63 at 3.) After this was escalated internally, the Bank began its investigation of the account opening process and transfer request. (*See, e.g.*, Def.'s Exs. 62-63.)

In early January 2018, the Bank drafted a "Corrective Communication Notice," which cited Hughes with violations of account opening policies and procedures and privacy policies by opening an account for a customer who was not present at the branch and by disclosing personal information to a non-account holder. (Def.'s Ex. 65.) The Notice also stated that Hughes failed to verify the source of the transfer request, explained that transfers should "never" be performed pursuant to "email or telephone requests," and reminded Hughes to use her "managerial experience and judgment . . . in any scenario where an email address is given, it is a person's name, and it does not match the account holder." (*Id.* at 2.)

The Notice was never provided to Hughes. (Def.'s SUMF ¶ 82; Pl.'s SDF ¶ 82.) The Bank states Hughes never received the document because it was not finalized until after she was terminated. (Def.'s SUMF ¶ 82.)

### ii. Disclosure of Information to Law Enforcement Without a Subpoena

On January 29, 2018, law enforcement contacted Hughes and requested a meeting to discuss a particular customer's account. (*Id.* ¶ 83; *see also* Def.'s Ex. 67 at 2; Def.'s Ex. 69 at 2.) Hughes stated that she "immediately called and alerted" Mike Urie (who oversaw the Bank's physical security operations) and Laura Biernacki (her manager) to inform them of this. (Def.'s Ex. 67 at 2.) The Bank maintains that Urie provided "helpful tips" to Hughes, suggesting she ask to see their official badges, not provide them with any documents, and refer the matter to the Fraud Department. (*Id.* at 1.) It further asserts that Hughes did not actually speak to Biernacki, as she had recently joined the Bank and was in a training session at the time. (Def.'s Ex. 69 at 2.) Hughes claims Urie told her "to check their ID[s] and that [she] could have a conversation with them." (*Id.* at 3.) She also maintains she spoke with Biernacki, who told her "to proceed, because it was no big deal." (Hughes Dep. at 7:20-8:9.)

The next day, January 30, Hughes met with officers from the FBI and Pennsylvania State Police. (Def.'s SUMF ¶ 88; Pl.'s SDF ¶ 88.) That evening, Hughes emailed Urie, Biernacki, two other Bank employees who dealt with fraud, and another individual who worked in branch administration to provide an "update and outcome of that meeting." (Def.'s Ex. 67 at 2.) Hughes explained that the officers were investigating two overdrawn checks processed in May 2017. (*See id.*) Hughes answered their questions regarding various Bank practices and policies, including whether the Bank would "verify funds" and how the Bank "determine[s] whether to pay an item." (*Id.*) She also noted that the officers "already had statements for the account" in question along with the business card from a Bank employee in the Fraud Department, Joe Bruno. (*Id.*) In a

subsequent email chain that did not include Hughes, various Bank employees lamented that Hughes did not contact the correct individuals at the Bank regarding the investigation and questioned why Hughes "would sit with the FBI and State Police and not refer them to us." (*Id.* at 1.)

The day after Hughes provided an update on the meeting, Nicola Fryer (from HR) and Stacey Ioia (a BSA Officer) interviewed Hughes regarding her discussion with the two officers. (Def.'s Ex. 69.) Fryer and Ioia learned that in addition to answering questions regarding Bank policy, Hughes printed out certain account statements and/or check information, manually redacted portions of the documents with a black marker, and provided the officers with copies of the documents. (*Id.* at 1; *see also* Hughes Dep. at 43:9-46:23.) It is undisputed that Hughes did not receive a subpoena from either officer during the meeting. (Def.'s Ex. 69 at 3; *see also* Hughes Dep. at 31:12-14, 435:10-20.) Hughes testified that when she "saw Joe Bruno's card on a stack of bank statements" the officers already had and was told by her "manager that it was okay," she thought it was fine to proceed because "everybody knew what was going on." (Hughes Dep. at 53:3-8.) She also testified that, at the time, she "probably knew [the details of the BSA] like the back of [her] hand." (*Id.* at 25:17-26:1.)

### iii.  **Termination**

Shortly after her January 31, 2018 interview with Fryer and Ioia, the Bank terminated Hughes for violating various Bank policies, including those related to the BSA, customer identification, and privacy, in connection with these two incidents. (Def.'s SUMF ¶ 99; *see also* Def.'s Ex. 69 at 3-4.) Hughes testified that she believed she was terminated "[b]ecause no one had [her] back. No one was going to agree that, yes, we instructed her to [meet with law enforcement]; she followed our instructions but we're going to let her go anyway." (Hughes Dep. at 59:12-21.)

### C.  Procedural History

Hughes filed a complaint with the Equal Employment Opportunity Commission ("EEOC") and Pennsylvania Human Rights Commission ("PHRC") on April 29, 2018. (Def.'s SUMF ¶ 11.) The EEOC issued a Right to Sue Letter on March 7, 2019. (Compl. ¶ 9.) This lawsuit was filed within 90 days and is therefore timely. (*Id.*)

## II.   STANDARD OF REVIEW

Summary judgment is appropriate where admissible evidence fails to demonstrate a genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Material facts are those "that could affect the outcome" of the proceeding, and "a dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury to return a verdict for the non-moving party." *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011). When the movant does not bear the burden of persuasion at trial, it may meet its burden on summary judgment by showing that the non-moving party's evidence is insufficient to carry its burden of persuasion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). Thereafter, the non-moving party may demonstrate a genuine issue of material fact if it provides evidence sufficient to allow a reasonable finder of fact to find in its favor at trial. *Anderson*, 477 U.S. at 248. "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 192 (3d Cir. 2015) (quoting *Anderson*, 477 U.S. at 252).

In reviewing the record, "a court must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Armbruster v. Unisys Corp.*, 32 F.3d 768, 777 (3d Cir. 1994). The court may not, however, make credibility determinations or

weigh the evidence in considering motions for summary judgment. *See Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000); *see also Goodman v. Pa. Tpk. Comm'n*, 293 F.3d 655, 665 (3d Cir. 2002).

## III.   DISCUSSION

Hughes sued the Bank for racial discrimination, retaliation, hostile work environment, and intentional infliction of emotional distress. The Bank seeks summary judgment on all counts. Because Hughes failed to proffer sufficient evidence on which a jury could reasonably find for her on any of her claims, the Court grants the Bank's motion in its entirety.

### A.   Racial Discrimination

Hughes's racial discrimination claims are subject to the *McDonnell Douglas* burden-shifting framework.[3] "To establish a *prima facie* case, a plaintiff must show that: (1) she is a member of a protected class; (2) she was qualified for the position at issue; (3) she suffered a materially adverse employment action; and (4) the circumstances of the adverse employment action support an inference of discrimination." *Heredia-Caines v. Lehigh Valley Hosp., Inc.*, 580 F. Supp. 3d 114, 125 (E.D. Pa. 2022) (citing *Whitmore v. Nat'l R.R. Passenger Corp.*, 510 F. Supp. 3d 295, 304 (E.D. Pa. 2020)) (italicization added). If a plaintiff establishes a *prima facie* case, the employer must offer legitimate, non-discriminatory reasons for the adverse employment action. *See Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994). "The employer satisfies its burden of production by introducing evidence which, taken as true, would permit the conclusion that there

---

[3]     Hughes asserts racial discrimination claims under 42 U.S.C. § 1981, Title VII, and the Pennsylvania Human Relations Act (PHRA). The same burden-shifting framework applies to claims brought under each statute. *See Blakney v. City of Phila.*, 559 F. App'x 183, 187 (3d Cir. 2014); *Tomaszewski v. City of Phila.*, 460 F. Supp. 3d 577, 593 (E.D. Pa. 2020).

was a nondiscriminatory reason for the unfavorable employment decision." *Id.* (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993)).

If the employer provides non-discriminatory reasons for its actions, the plaintiff must then prove that the employer's "explanation is merely a pretext for the discrimination." *Tourtellotte v. Eli Lilly & Co.*, 636 F. App'x 831, 842 (3d Cir. 2016). The plaintiff "must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Id.* (quoting *Tomasso v. Boeing Co.*, 445 F.3d 702, 706 (3d Cir. 2006)). In doing so, the "plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them 'unworthy of credence.'" *Fuentes*, 32 F.3d at 765 (quoting *Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 531 (3d Cir. 1992)).

Hughes is a member of a protected class and she suffered an adverse employment action when she was terminated. For the purposes of this motion, the Court will assume she was qualified for the position she held.

The Bank asserts that Hughes cannot establish a *prima facie* case of racial discrimination because her termination did not occur under circumstances giving rise to an inference of discrimination. (Def.'s Mem. of Law in Support of its Mot. for Summ. J. [Def.'s Mem.] at 7.) Further, the Bank argues that it had legitimate, non-discriminatory reasons for terminating Hughes, which Hughes cannot show are pretextual. (*Id.*)

### i.  Inference of Discrimination

To satisfy the final element of a *prima facie* case, a plaintiff must show "some causal nexus" between her protected status and defendant's adverse treatment. *Jones v. Se. Pa. Transp.*

*Auth.*, 796 F.3d 323, 327 (3d Cir. 2015) (quoting *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 798 (3d Cir. 2003)). Hughes claims she has satisfied this requirement by recounting "a plethora of incidents" she endured throughout her career at the Bank that culminated in her termination. (Pl.'s Mem. of Law in Opp. to Def.'s Mot. for Summ. J. [Pl.'s Opp.] at 14-15.) However, she has "not pointed to any demonstrated nexus between" the alleged discrimination she endured and the Bank's decision to terminate her. *Johnson v. Hershey Creamery Co.*, No. 11-776, 2013 WL 877130, at *7 (M.D. Pa. Mar. 8, 2013).

As explained further below, "[t]he record is devoid of evidence supporting an inference that" Hughes's termination was the "product[] of discrimination instead of the natural result of [the Bank's] investigation into the allegations of" violations of its policies. *Jones*, 796 F.3d at 327. In fact, the last alleged incident of discrimination Hughes endured occurred in 2017, when DiBello asked her to "take one for the team" by taking the blame for a BSA violation. (Hughes Dep. at 294:12-296:3; *see also* Def.'s SUMF ¶ 65; Pl.'s SDF ¶ 65.) But Hughes does not connect this incident to race in any way or show that there is any connection between her termination and this incident. *See Dykes v. Marco Grp., Inc.*, 222 F. Supp. 3d 418, 428-29 (E.D. Pa. 2016) (rejecting argument that termination was motivated by racial discrimination where there was "nothing even arguably racial in" statements at issue and there was "no evidence that [the speaker] was involved in the decision to terminate Plaintiff's employment"). Although Hughes has recounted a history of purported discrimination from her colleagues and superiors, "[t]hese incidents are not sufficiently linked to [her] termination and consequently fail to support the requisite discriminatory intent behind her termination." *Tourtellotte*, 636 F. App'x at 845.

### ii. **The Bank's Legitimate, Non-Discriminatory Reasons for Hughes's Termination**

Even if Hughes had established the final element of her *prima facie* case, the Bank would still prevail because it has offered a legitimate, non-discriminatory reason for Hughes's termination: Hughes committed two separate violations of Bank policies. (*See* Def.'s Mem. at 7-8; *see also* Def.'s SUMF ¶¶ 68, 75, 81, 98-99.)

First, in December 2017, the Bank learned that several months earlier, Hughes verified a hospitalized patient's identity over FaceTime while helping her open a new account virtually. (*See* Def.'s SUMF ¶¶ 70-74.) She also sent the customer signature cards to sign via unsecured email to an email address that did not appear to belong to the customer. (*See id.* ¶ 77; Def.'s Ex. 62.) A few hours later, after receiving a transfer request from the same mismatched email address, Hughes transferred nearly all of the account's proceeds to an account controlled by the customer's brother. (*See* Def.'s SUMF ¶¶ 77, 79; Def.'s Exs. 62, 65.)

The Bank drafted a "Corrective Communication Notice" after investigating this incident and concluded that Hughes violated account opening procedures and privacy policies and failed to use proper judgment when executing the transfer request when she did not verify its authenticity. (*See* Def.'s Ex. 65; *see also* Def.'s Ex. 255.) The Bank maintains that Hughes violated the Bank's BSA/Anti-Money Laundering Policy and Program (the "BSA/AML Policy") by opening the account while Lebron was not physically in the branch. (Def.'s SUMF ¶ 75.) The BSA/AML Policy provides that the Bank "will not open deposit accounts by telephone, by mail, over the Internet, or any time a customer is not physically present, other than for an existing customer." (Def's. Ex. 256 at 230.) It provides for certain exceptions, including opening Certificates of Deposits through marketing campaigns and allowing customers to initiate the account opening process over the internet, among others. (*Id.* at 230-32.) Hughes admitted that none of the

14

exceptions applied for Lebron's account opening but nonetheless asserted that the Bank opened accounts for individuals not physically present in a branch "all the time." (Hughes Dep. at 499:22-508:12.)

Second, on January 30, 2018, Hughes met with law enforcement officers investigating allegations of fraud and provided them information and documents without a subpoena. (*See* Def.'s Mem. at 8; *see also* Def.'s Ex. 69 at 3.) Although Hughes maintains she received permission from Urie and Biernacki to meet with the officers, Hughes does not dispute that the officers never provided her with a subpoena at any point during the meeting. (*See* Def.'s SUMF ¶ 95; Hughes Dep. at 31:12-14, 435:10-20.) The next day, Fryer and Ioia interviewed Hughes regarding the meeting and concluded that Hughes violated several Bank policies, including those related to the BSA. (Def.'s SUMF ¶ 99; *see also* Def.'s Ex. 69 at 3-4.) Following that interview, the Bank terminated Hughes given that this was her second violation of Bank policies. (*See* Def.'s Ex. 69.)

Accordingly, the Bank has offered a non-discriminatory explanation for its conduct. *See Brooks v. Temple Univ. Health Sys., Inc.*, No. 21-1803, 2022 WL 1062981, at *5 (E.D. Pa. Apr. 8, 2022) (finding violations of policy prohibiting improper workplace conduct a non-discriminatory reason for termination); *Johnson v. Phila. Hous. Auth.*, 218 F. Supp. 3d 424, 433 (E.D. Pa. 2016) (finding violation of policy prohibiting workplace violence a non-discriminatory reason for termination).

### iii.  Pretext

Hughes fails to rebut this explanation as pretextual. Contemporaneous documents and Hughes's own deposition testimony establish that she opened an account over FaceTime, transferred funds based on an email request, and provided law enforcement with documents without a subpoena in violation of Bank policies. (*See* Def.'s Ex. 62; Hughes Dep. at 60:18-21, 435:10-20.) The Bank was in the process of investigating the first incident when the second

15

incident occurred. When it learned of the second incident, the Bank swiftly investigated the matter and decided to terminate Hughes.

Hughes disputes various aspects of the incidents in question and the Bank's course of action, including whether she should have received a warning or another form of discipline prior to termination. (*See* Hughes Dep. at 60:3-7.) But "in greater or lesser degrees, [she] has admitted" to the misconduct prompting her termination. *Joseph v. Cont'l Airlines, Inc.*, 126 F. Supp. 2d 373, 378 (E.D. Pa. 2000). Her criticisms and challenges "at best, only undermine the wisdom of the decision to terminate; they in no way suggest any racial animus on [the Bank's] part nor raise any doubt as to [the Bank's] reasonable belief that Plaintiff engaged in serious misconduct justifying termination." *Id.* But it is not enough for Hughes to "simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." *Fuentes*, 32 F.3d at 765. Rather, Hughes must show that the decision was "so plainly wrong that it cannot have been the employer's real reason." *Keller v. Orix Credit All., Inc.*, 130 F.3d 1101, 1109 (3d Cir. 1997). Hughes fails to meet this high bar.

Hughes "presented no evidence to discredit [the Bank's] legitimate nondiscriminatory reasons for her termination, and no evidence from which a fact finder could infer that [the Bank's] actions were motivated by discriminatory animus." *Jones v. Temple Univ.*, 622 F. App'x 131, 135 (3d Cir. 2015) (citing *Burton v. Teleflex Inc.*, 707 F.3d 417, 430 (3d Cir. 2013)). Hughes has consequently failed to rebut the Bank's non-discriminatory explanation for its decision to terminate her. *See Johnson*, 218 F. Supp. 3d at 434 (rejecting plaintiff's pretext arguments where termination resulted from investigation into violation of company policy); *Joseph*, 126 F. Supp. 2d at 377-78 (same).

The Bank's motion for summary judgment with respect to Hughes's discrimination claims is therefore granted.

### B.  Retaliation

Retaliation claims under Title VII and the PHRA are subject to the *McDonnell-Douglas* burden shifting framework. *See Anderson v. Boeing Co.*, 694 F. App'x 84, 85-86 (3d Cir. 2017). To establish a *prima facie* case of retaliation, a plaintiff must show "that: '(1) she engaged in activity protected by Title VII; (2) the employer took an adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action." *Moore v. City of Phila.*, 461 F.3d 331, 340-41 (3d Cir. 2006) (quoting *Nelson v. Upsala Coll.*, 51 F.3d 383, 386 (3d Cir. 1995)). To assess whether protected activity and retaliatory conduct are causally connected, a court may analyze "the temporal proximity between the two if 'unusually suggestive,'" or in the alternative, "the circumstances as a whole, including any intervening antagonism by the employer, inconsistencies in the reasons the employer gives for its adverse action, and any other evidence suggesting that the employer had a retaliatory animus when taking the adverse action." *Daniels*, 776 F.3d at 196 (quoting *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 232 (3d Cir. 2007)).

Once a plaintiff has established a *prima facie* case, the employer must provide "'a legitimate, non-retaliatory reason' for its conduct." *Moore*, 461 F.3d at 342 (quoting *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500-01 (3d Cir. 1997)). The plaintiff may rebut this explanation by showing the employer's reasons for its conduct are pretextual. *Id.* "[T]he plaintiff must produce 'sufficient evidence to raise a genuine issue of fact as to whether the employer's proffered reasons were not its true reasons for the challenged employment action.'" *Krouse*, 126 F.3d at 504 (quoting *Sheridan v. E.I. DuPont de Nemours & Co.*, 100 F.3d 1061, 1067 (3d Cir. 1996)). To cast enough

doubt onto the employer's proffered reasons, a plaintiff must show "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence.'" *Whitmore*, 510 F. Supp. 3d at 309 (quoting *Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 306 (3d Cir. 2007)).

Hughes suffered an adverse employment action when she was terminated, but she has not demonstrated that she engaged in any protected activity. Nor has she shown the required causal connection between any alleged protected activity and her termination. Finally, she fails to rebut the Bank's legitimate, non-retaliatory reasons for her termination as pretextual. Her retaliation claim therefore fails and the Bank is entitled to summary judgment.

### i. Protected Activity

For purposes of establishing a *prima facie* case of retaliation, "protected activity" includes formally filing of charges of discrimination with the EEOC as well as various informal protests. *See Daniels*, 776 F.3d at 193. But it is not the case that any complaint will constitute protected activity. "A general complaint of unfair treatment is insufficient to establish protected activity under Title VII." *Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc.*, 450 F.3d 130, 135 (3d Cir. 2006). To constitute protected activity, a plaintiff's complaint "must allege that the opposition was to discrimination based on a protected category, such as age or race." *Daniels*, 776 F.3d at 193. Courts should "look to the message being conveyed rather than the means of conveyance" in determining whether a plaintiff engaged in protected conduct. *Curay-Cramer*, 450 F.3d at 135.

Hughes does not specify precisely what conduct she engaged in that prompted retaliation.[4] Rather, she states that "she spoke out and reported discrimination and mistreatment to HR and her superiors on multiple occasions prior to her termination." (Pl.'s Opp. at 21.) Over the course of her career at the Bank, Hughes had several negative interactions with superiors that she believes were discriminatory. *See generally* Section I.A. Although Hughes disputes the Bank's contention that she never complained about these incidents, she has provided no evidence disputing that fact.

Even assuming Hughes complained to HR about these incidents, she has still failed to point to anything in the record which would indicate that these informal complaints included specific references of discrimination to elevate "[a] general complaint of unfair treatment" to "protected activity under Title VII." *Curay-Cramer*, 450 F.3d at 135.

The closest Hughes comes to establishing that she engaged in protected activity is the November 2016 email she sent to Savino, Novak, and Stryker in response to a performance review which she felt was unfair. (*See* Def.'s Ex. 223.) Hughes assiduously objected to and rebutted each of the charges made against her in her November 2016 performance review. But at no point did she assert or even insinuate that she was being discriminated against based on race or any other status protected by Title VII. (*See id.*)

In her deposition, Hughes stated that she believed Savino's characterization of her as "confrontational" was about her race. (Hughes Dep. at 281:10-15). But she did not assert that in her email and this allegation is not found anywhere else in the record. Accordingly, this email does not constitute "protected activity" for purposes of her retaliation claim. *See Barber v. CSX Distrib.*

---

[4]     Hughes cannot rely upon her EEOC filing to satisfy the protected activity element because it was filed in July 2018, six months after her purportedly retaliatory termination. *See Daniels*, 776 F.3d at 196 (rejecting retaliation claim based on purported adverse employment action that "preceded [plaintiff's] first protected activity").

*Servs.*, 68 F.3d 694, 701-02 (3d Cir. 1995) (holding that a letter to HR complaining of unfair treatment did not constitute protected activity for purposes of a retaliation claim because it did "not specifically complain about age discrimination"); *see also Still v. Cummins Power Sys.*, No. 07-5235, 2009 WL 57021, at *11 (E.D. Pa. Jan. 8, 2009) (granting summary judgment on retaliation claim because there was "simply no evidence from which a trier of fact could reasonably infer that plaintiff's . . . e-mail constituted opposition to racial discrimination").

### ii.  Causation

Even if Hughes were able to establish that she engaged in protected activity, she still fails to make the requisite showing of causation to survive the Bank's motion for summary judgment. At the *prima facie* stage, to establish causation, "a plaintiff need only proffer evidence sufficient to raise the inference that her engagement in a protected activity was the *likely reason* for the adverse employment action, not the but-for reason."[5] *Carvalho-Grevious v. Del. State Univ.*, 851 F.3d 249, 253 (3d Cir. 2017).

A plaintiff can satisfy the causation element of the *prima facie* case by a showing of "unusually suggestive" temporal proximity between the protected activity and the adverse employment action. *Daniels*, 776 F.3d at 196 (quoting *LeBoon*, 503 F.3d at 232). "Although there is no bright line rule as to what constitutes unduly suggestive temporal proximity," the Third Circuit has stated that "a gap of three months between the protected activity and the adverse action, without more, cannot create an inference of causation and defeat summary judgment." *LeBoon*, 503 F.3d at 233; *see also Andreoli v. Gates*, 482 F.3d 641, 650 (3d Cir. 2007) (five months between

---

[5]     Despite Hughes's contention otherwise (*see* Pl.'s Opp. at 22), retaliation claims under Title VII "must be proved according to traditional principles of but-for causation, not the lessened" "motivating factor" causation standard. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013). Specifically, a plaintiff asserting retaliation must show that "her protected activity was a but-for cause of the alleged adverse action by the employer." *Id.* at 362.

protected activity and adverse action "insufficient to raise an inference of causation" absent other evidence).

The alleged protected activity which is closest in time to Hughes's January 2018 termination is her November 2016 email challenging the substance of her performance review. (*See* Def.'s Ex 223). Assuming this email constituted protected activity, the Court finds that the gap of more than 12 months until Hughes's termination is not "unusually suggestive." *See Daniels*, 776 F.3d at 198 (ten months insufficient to establish causal connection).

Nonetheless, a lack of temporal proximity alone is not "legally conclusive proof against retaliation." *See Marra*, 497 F.3d at 302 (quoting *Robinson v. Se. Pa. Transp. Auth.*, 982 F.2d 892, 894 (3d Cir. 1993)). In the absence of temporal proximity, a Court must examine "the circumstances as a whole," including any evidence "suggesting that the employer had a retaliatory animus when taking the adverse action." *Daniels*, 776 F.3d at 196. Even under this broader standard, Hughes fails to establish the necessary inference of causation.

Hughes has not pointed to any evidence in the record that would indicate intervening antagonism suggestive of retaliation in the time between Hughes's November 2016 email (or for that matter, any complaints she made) and her termination. According to Hughes, she first complained of mistreatment in 2008, after her manager threw her papers on the floor. (*See* Hughes Dep. at 227:18-228:15.) She lodged several additional complaints in the ensuing years, (*see generally* Section I.A), but her job responsibilities were never decreased and her pay was never reduced. (*See* Def.'s SUMF ¶ 9; Pl.'s SDF ¶ 9.) She was promoted twice and was selected to be the Branch Manager of a brand-new location the Bank opened in December 2012. (Def.'s SUMF ¶ 8; Pl.'s SDF ¶ 8; *see also* Def.'s Ex. 16 at 24.)

Nothing in the record suggests the Bank disciplined or otherwise retaliated against Hughes following her November 2016 email. More than a year later, in December 2017, the Bank opened an investigation into Hughes when it received a customer complaint that implicated her in potential wrongdoing. But it was eminently reasonable for the Bank to do so after learning that Hughes may have opened an account in an unauthorized manner and transferred $45,000 without following proper procedures. (*See* Def.'s Ex. 65 at 1-2.)

Notably, the Bank has consistently explained that it fired Hughes because, while investigating her initial breach of Bank policy, she committed another infraction by providing documents to law enforcement without a subpoena. (Def.'s SUMF ¶ 99; *see also* Def.'s Ex. 69.) Accordingly, Hughes has failed to show any retaliatory animus by the Bank or causal connection between her protected conduct and her termination. *See Daniels*, 776 F.3d at 199.

### iii.  Pretext

Finally, even if Hughes were able to establish a *prima facie* case of retaliation, the Bank would still be entitled to summary judgment. Hughes has not pointed to any evidence that casts doubt on the Bank's explanation for her termination, let alone "sufficient evidence" that would allow a jury to "find by a preponderance of the evidence that [the Bank's] explanations offered for its adverse employment decisions were merely a pretext for unlawful retaliation." *Marra*, 497 F.3d at 306; *see also supra* at subsection III.A.iii.

The Bank's motion is therefore granted.

### C.  Hostile Work Environment

"To establish a hostile work environment claim," Hughes must show: "(1) that she suffered intentional discrimination because of her race . . . ; (2) that the discrimination was severe or pervasive; (3) that the discrimination detrimentally affected the plaintiff; (4) that the discrimination would detrimentally affect a reasonable person in like circumstances[;] and (5) the existence

of *respondeat superior* liability."[6] *Davis*, 2022 WL 970842, at *5 (citing *Minarsky v. Susquehanna Cnty.*, 895 F.3d 303, 310 (3d Cir. 2018)). A hostile work environment exists when a "workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). To determine whether such an environment exists, "a court must consider the totality of the circumstances, including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 168 (3d Cir. 2013) (quoting *Harris*, 510 U.S. at 23).

### i. Applicable Limitations Periods under Title VII and the PHRA

Prior to asserting claims under Title VII and the PHRA in federal court, plaintiffs in Pennsylvania must exhaust administrative remedies with both the EEOC and the PHRC. *See Mandel*, 706 F.3d at 163. Title VII provides that charges of discrimination "shall be filed within one hundred and eighty days after the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e-5(e)(1). However, if the charges are also filed "with a State or local agency with authority to grant or seek relief from such practice," such as the PHRA, then the limitations period is enlarged to "within three hundred days after the alleged unlawful employment practice occurred." *Id.*; *see also Drake v. Steamfitters Local Union No. 420*, No. 01-6968, 2005 WL 196444, at *6 (E.D. Pa. Jan. 27, 2005). Although the PHRA, like Title VII, requires filing a charge of

---

[6]     Hughes's hostile work environment claims under Title VII and the PHRA "are subject to the same legal standard, so the Court will analyze them together." *Davis v. Elwyn, Inc.*, No. 20-5798, 2022 WL 970842, at *5 (E.D. Pa. Mar. 31, 2022) (citing *Atkinson v. Lafayette Coll.*, 460 F.3d 447, 464 n.6 (3d Cir. 2006)).

discrimination within 180 days, it does not contain an analogous enlargement provision. *See Brown v. Tait Towers Mfg., LLC*, No. 21-4573, 2022 WL 206177, at *4 (E.D. Pa. Jan. 21, 2022). In effect, this means that the limitations period for a plaintiff's Title VII claims can be greater than the limitations period for her PHRA claims. *See Mandel*, 706 F.3d at 164-65 (agreeing with district court's application of different statutes of limitations for Title VII and PHRA claims); *Brown*, 2022 WL 206177, at *3-4. Such is the case here.

"Hughes jointly filed her EEOC and PHRA claims on July 11, 2018." (Def.'s Mem at 11; *see also* Def.'s Ex. 16.) Accordingly, conduct is actionable in this lawsuit only if it occurred after September 14, 2017 (under Title VII) or after January 12, 2018 (under the PHRA). *See Brown*, 2022 WL 206177, at *4.

## ii.   The Continuing Violation Doctrine

The continuing violation doctrine provides an exception to these statutes of limitations by allowing a plaintiff to aggregate "discriminatory acts that are not individually actionable . . . to make out a hostile work environment claim; such acts 'can occur at any time so long as they are linked in a pattern of actions which continues into the applicable limitations period.'" *Mandel*, 706 F.3d at 165 (quoting *O'Connor v. City of Newark*, 440 F.3d 125, 127 (3d Cir. 2006)). To invoke the continuing violation doctrine, "the plaintiff must show that all acts which constitute the claim are part of the same unlawful employment practice and that at least one act falls within the applicable limitations period." *Id.* at 165-66 (citing *Morgan*, 536 U.S. at 122). Therefore, "the employee need only file a charge within 180 or 300 days of any act that is part of the hostile work environment" for a claim to be timely. *Morgan*, 536 U.S. at 118.

In contrast, "discrete acts, which are individually actionable," such as "termination, failure to promote, denial of transfer, refusal to hire, wrongful suspension, wrongful discipline, denial of

training, [and] wrongful accusation," cannot be aggregated. *O'Connor*, 440 F.3d at 127. For these "discrete acts," "the limitations period runs from the act." *Id.*

### iii.   **Hughes's Hostile Work Environment Claim**

The only conduct Hughes complains of that could be used to establish a continuing violation is DiBello's request that she "take one for the team" and assume responsibility for a BSA violation another team member committed.[7] (Hughes Dep. at 294:12-296:3; *see also* Def.'s SUMF ¶ 65; Pl.'s SDF ¶ 65.) This event occurred "some time in 2017." (Def.'s SUMF ¶ 65; Pl.'s SDF ¶ 65.) Accordingly, it could only be used to support Hughes's Title VII claim because it falls outside the limitations period for her PHRA claim.

Even if the Court used this statement as a basis for applying the continuing violation theory and considered the remainder of the time-barred incidents Hughes recounted,[8] her Title VII hostile work environment claim still fails to survive the Bank's motion for summary judgment. Hughes identified several inappropriate incidents that undoubtedly made her "uncomfortable." *Laye v. Potter*, No. 04-0046, 2006 WL 1617777, at *6 (W.D. Pa. June 2, 2006). These included, among others, having papers thrown at her, being yelled at by a manager, being told not to pursue business

---

[7]     Hughes's termination is a "discrete act" that cannot be aggregated with other conduct for purposes of this analysis. *See O'Connor*, 440 F.3d at 127.

[8]     The Bank argues that this incident "cannot give rise to a continuing violation because there is no admissible evidence that the event ever occurred, and even if such an event occurred, wrongful discipline or a wrongful accusation is a discrete, individually actionable event that cannot be used as a hook for time-barred conduct." (Def.'s Mem. at 16 (citing *O'Connor*, 440 F.3d at 127).) For the purposes of this motion, the Court assumes the event occurred (and that it occurred within the limitations period). This incident is not a "wrongful accusation" because Hughes was not accused of any improper conduct. It is not clear whether this incident could fairly be characterized as "wrongful discipline" because, other than Hughes's claim that a BSA violation was attributed to her following this conversation, the record does not reflect that Hughes was actually disciplined in any way. Therefore, the Court will assume that this is not a discrete act and that it could serve as the basis for invoking the continuing violation doctrine.

in certain geographic areas, being criticized for her appearance, and being told that she would not receive another perfect evaluation.

These incidents spanned more than a decade. Even assuming they were all discriminatory based on Hughes's race, they did not affect her work performance. *See Sherrod v. Phila. Gas Works*, 57 F. App'x 68, 76-77 (3d Cir. 2003) (rejecting hostile work environment claim where conduct did not "unreasonably interfere[] with [plaintiff's] work performance"). Nor has Hughes shown they were sufficiently severe or pervasive to constitute a material change to her conditions of employment. *See Hamera v. Cnty. of Berks*, 248 F. App'x 422, 425 (3d Cir. 2007) (affirming district court's determination that "nine [insensitive] comments over a year and four months" were not "sufficiently severe or pervasive" to maintain a hostile work environment claim); *Davis v. Solid Waste Servs., Inc.*, 20 F. Supp. 3d 519, 536 (E.D. Pa. 2014) (finding "periodic and indirect offensive conduct . . . not so 'severe or pervasive' to amount to a material change in the conditions of employment, and therefore" insufficient to support "a hostile work environment claim"); *Tourtellotte v. Eli Lilly & Co.*, No. 09-774, 2013 WL 1628606, at *6 (E.D. Pa. Apr. 16, 2013) (finding "less than a dozen interactions . . . over the course of eighteen months" insufficiently pervasive or regular for hostile work environment claim), *aff'd*, 636 F. App'x 831 (3d Cir. 2016); *Ocasio v. Lehigh Valley Family Health Ctr.*, 368 F. Supp. 2d 370, 377 (E.D. Pa. 2003) (finding "separate, isolated acts that occurred at distinct times" over the course of three years insufficient to establish a hostile work environment claim), *aff'd*, 92 F. App'x 876 (3d Cir. 2004).

The Court does not doubt that Hughes "subjectively believe[d] that her treatment was discriminatory" and that she was subjected to a hostile work environment. *Hanzer v. Nat'l Mentor Healthcare, LLC*, No. 12-363, 2014 WL 1390889, at *4 (D. Del. Apr. 10, 2014). But "she has not presented a genuine issue of fact to overcome summary judgment with respect to her hostile work

environment claim." *Id.*; *see also Reid v. Sleepy's, LLC*, No. 14-2006, 2016 WL 3345521, at *11-13 (M.D. Pa. June 16, 2016) (granting summary judgment on hostile work environment claim relying on continuing violation theory because, even considered collectively, "Plaintiff has failed to submit sufficient evidence for a reasonably jury to find that the alleged harassment was severe or pervasive enough to constitute a hostile work environment").

The Court therefore grants the Bank's motion for summary judgment with respect to Hughes's hostile work environment claims.

### D.  Intentional Infliction of Emotional Distress

Hughes also asserts a claim of intentional infliction of emotional distress. The Bank argues that the Pennsylvania Workman Compensation Act preempts this claim. (Def.'s Mem. at 22.) Hughes "does not contest Defendant's Motion for Summary Judgment as to" this claim. (Pl.'s Opp. at 11 n.6.) The Court therefore grants summary judgment in favor of the Bank on this claim.

## IV.  CONCLUSION

For the reasons discussed above, the Court grants the Bank's motion for summary judgment as to all claims.

An Order consistent with this Memorandum will be docketed separately.